# EXHIBIT A

STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO.

| | | |
|---|---|---|
| STATE OF MAINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| VOLKSWAGEN AG, | ) | **COMPLAINT** |
| AUDI AG, | ) | |
| VOLKSWAGEN GROUP OF AMERICA, INC., | ) | |
| AUDI OF AMERICA, LLC, | ) | |
| VOLKSWAGEN GROUP OF AMERICA | ) | |
| CHATTANOOGA OPERATIONS, LLC, | ) | |
| DR. ING. H.C. F. PORSCHE AG, | ) | |
| and | ) | |
| PORSCHE CARS NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## NATURE OF THE ACTION

1.      The State of Maine ("State") seeks civil penalties and injunctive relief for violations of Maine's environmental laws caused by the above-named defendants (collectively "Defendants") related to their installation of emission control "defeat devices" in Volkswagen, Audi, and Porsche models equipped with 2.0 liter and 3.0 liter diesel engines (the "Subject Vehicles") from the 2009-2016 model years.  These "defeat devices" detected and then switched on (or ramped up) emission control equipment when the diesel vehicles were undergoing emission tests, and then turned off (or dialed down) the pollution control when the vehicles were driven on the road.  More than 573,000 of the Subject Vehicles with "defeat devices" were sold or leased in the U.S. between 2008 and 2015 and about 3,500 in Maine.

2.      Maine has adopted California's strict emission standards for new vehicles, including for emissions of nitrogen oxides ("$NO_x$"), as part of Maine's efforts to address ground-level ozone pollution.  Ozone is formed when $NO_x$ emitted by motor vehicles and other sources combines in the atmosphere with volatile organic compounds ("VOCs") in a complicated reaction in the presence of heat and sunlight.  Ozone causes or contributes to many human respiratory problems, including chest pains, shortness of breath, coughing, nausea, throat irritation and increased susceptibility to respiratory infections, such as asthma, and disproportionately affects vulnerable members of society, particularly children and the elderly. The use of "defeat devices" made the Subject Vehicles emit substantially higher levels of $NO_x$, up to 40 times the legal limit, when the vehicles were driven on the road compared to during testing conditions, in violation of Maine law.  Defendants' violations strike at the heart of Maine's and other states' environmental laws designed to protect public health by strictly limiting motor vehicle pollution.

3.      On June 28, 2016, Defendants announced that they had reached a partial settlement (which was approved by the federal court on October 25, 2016), that would resolve: (a) claims brought by car owners and the Federal Trade Commission for consumer deception in connection with its marketing and sale of the 2.0 liter Subject Vehicles, and (b) claims for injunctive relief brought by the U.S. Environmental Protection Agency ("EPA"), California, and the California Air Resources Board ("CARB") to redress environmental harm.  On or around the same date, many states, including Maine, announced that they had settled their claims against Defendants for penalties arising under state laws that prohibit consumer deception.  None of these settlements addressed the civil penalty claims of state governments, including Maine, for Defendants' violations of state environmental laws.  Defendants' liability for claims arising

2

under environmental laws and regulations, which is the subject of the present Complaint, was expressly left open by Maine and other states in their partial settlements with Defendants.

4.      The State of Maine, by and through its Attorney General, brings this action pursuant to Maine's Protection and Improvement of Air Law, 38 M.R.S. §§ 581-610-D ("Maine Air Law") and Maine's New Motor Vehicle Emissions Standards, 06-096 CMR ch. 127 ("Maine LEV Rule").  Together with appropriate injunctive and equitable relief and reasonable costs and attorneys' fees, the State seeks imposition against Defendants of civil penalties for violations of Maine's environmental laws in amounts sufficient to deter them, as well as other automakers, from engaging in and repeating this form of deliberate misconduct.

## PARTIES

5.      Plaintiff State of Maine is a sovereign state and brings this action by and through its Attorney General pursuant to the powers vested in her by the common law and by 5 M.R.S. § 191 as the chief law enforcement officer of the State of Maine, as well as under 38 M.R.S. § 348.

6.      Defendant Volkswagen AG is a corporation organized under the laws of Germany and has its principal place of business in Wolfsburg, Germany.  At all times relevant to this complaint, Volkswagen AG designed, manufactured, marketed, and sold motor vehicles including the Volkswagen, Audi, and Porsche brands.  Volkswagen AG is the parent company of the Volkswagen Group ("VW Group"), an organizational and trade term referring to Volkswagen AG's automotive brands and financial services business.  Volkswagen AG is the ultimate parent of the other Defendants named in this Complaint.

7.      Volkswagen AG and the VW Group are managed by Volkswagen AG's Board of Management. Each brand in the VW Group also has its own Brand Board of Management.  The

members of the Brand Boards of Management manage their respective brands, pursuant to targets and requirements laid down by the Volkswagen AG Board of Management.

8.      Defendant Audi AG is a member of the VW Group.  Audi AG is a corporation organized under the laws of Germany, and has its principal place of business in Ingolstadt, Germany. Volkswagen AG, which owns 99.55% of Audi AG's stock, controls Audi AG.  At all times relevant to this complaint, Audi AG designed, manufactured, marketed, and sold automobiles under the Audi brand name, including Subject Vehicles delivered for sale or lease in Maine.  Audi AG also sold and supplied its 3.0-liter engine to Porsche AG for use in the U.S. market including Maine.

9.      Defendant Volkswagen Group of America, Inc. ("VWGoA") is a New Jersey corporation that registered to do business in Maine on September 7, 2000 under the name of Volkswagen of America, Inc. and later amended its registration on December 28, 2007 to reflect a name change to Volkswagen Group of America, Inc.  In 2008, VWGoA registered in Maine to do business under the assumed names of Audi of America, Inc. and Volkswagen of America, Inc.  VWGoA does business in all fifty states and the District of Columbia and maintains a principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia. VWGoA is a wholly-owned subsidiary of Volkswagen AG.  Acting in concert with other Defendants, VWGoA manufactured Subject Vehicles, which included installing defeat devices, and marketed and delivered Subject Vehicles for sale or lease in Maine.  Within VWGoA, the Engineering and Environmental Office ("EEO") interacts with U.S. regulators and handles regulatory compliance and certification-related issues for Volkswagen AG and Audi AG.

10.     Defendant Audi of America, LLC ("AoA"), also known as Audi of America, Inc. or Audi of America, is a Delaware limited liability company with its principal place of business

located at 2200 Ferdinand Porsche Drive, Herndon, Virginia.  AoA is a wholly owned subsidiary and operating unit of VWGoA.  AoA marketed and delivered for sale or lease Subject Vehicles in the United States, including Maine.  VWGoA is responsible for the acts of AoA.  AoA is closely controlled and directed by Volkswagen AG and Audi AG.

11.     Defendant Volkswagen Group of America Chattanooga Operations, LLC ("VW Chattanooga") is a Tennessee limited liability company with its principal place of business located at 8001 Volkswagen Drive, Chattanooga, Tennessee.  VW Chattanooga operates a manufacturing plant and is a wholly owned subsidiary of VWGoA.  VW Chattanooga manufactured some of the Subject Vehicles, specifically the Volkswagen Passat turbocharged direct injection ("TDI") diesel vehicles, and delivered or arranged for delivery of these cars for sale or lease in the U.S., including Maine.

12.     Defendant Dr. Ing. h.c. F. Porsche AG d/b/a Porsche AG ("Porsche AG") is a member of the VW Group.  Porsche AG is a corporation organized under the laws of Germany, has its principal place of business in Stuttgart, Germany, and is a wholly-owned subsidiary of Volkswagen AG.  Porsche AG purchased and installed unlawful 3.0 liter TDI engines in Subject Vehicles, which it then delivered for sale or lease throughout the U.S., including Maine.

13.     Defendant Porsche Cars North America, Inc. ("Porsche NA") is a Delaware corporation that registered to do business in Maine on January 27, 1999.  Porsche NA has its principal place of business at One Porsche Drive, Atlanta, Georgia.  Porsche NA carries out much of the business of Porsche in the United States.  Porsche NA is a wholly-owned subsidiary of Porsche AG and is closely controlled and directed by Porsche AG.  Porsche NA marketed and delivered for sale or lease Subject Vehicles throughout the U.S. and submitted documentation to regulators to obtain certifications of compliance with emission requirements for those vehicles.

5

14.     Each of the Defendants is a "person" and/or a "manufacturer" as those terms are used in the Maine LEV Rule.  "Manufacturer" is defined in the Maine LEV Rule, 06-096 CMR Chapter 127, § 2(X), and "person" is defined in the Maine Air Law, 38 M.R.S. § 582(9).

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 4 M.R.S. § 105 and 38 M.R.S. § 348, has personal jurisdiction over the Defendants pursuant to 14 M.R.S. § 704-A, and has authority to grant the relief requested pursuant to 38 M.R.S. §§ 348 and 349.

16.     At all relevant times, all of the Defendants have purposefully availed themselves of this forum through the conduct described in this complaint.  Further, Defendants Volkswagen AG, Audi AG, and Porsche AG:

a.     designed the Subject Vehicles, with their defeat device software, for sale within the U.S., including within Maine;

b.     directed VWGoA's Michigan-based Engineering and Environmental Office ("EEO") and Porsche NA to submit to U.S. and state regulators applications for certification to sell the Subject Vehicles in the U.S., including within Maine;

c.     directed VWGoA's EEO and Porsche NA to make periodic submissions and certifications regarding the Subject Vehicles' compliance with applicable emissions standards and requirements to U.S. regulators, including the Maine Department of Environmental Protection ("Department"), as required by the Maine LEV Rule;

6

d.      oversaw and/or directed VWGoA's, AoA's, and Porsche NA's development and placement of false and misleading marketing and advertising of the Subject Vehicles (including as "Clean Diesel") to U.S. consumers, including in Maine;

e.      directed VWGoA, AoA, and Porsche NA to expressly warrant to Maine buyers and lessees the Subject Vehicles' compliance with applicable emissions standards;

f.      directed VWGoA to issue to Maine buyers and lessees false and/or misleading recall notices in or around January and March 2015; and

g.      controlled and directed VWGoA's, AoA's, and Porsche NA's interactions with and message to U.S. regulators and the public, including consumers in Maine, in the aftermath of the 2014 independent study that led to the exposure of Volkswagen's fraud to the public.

17.     In addition, all Defendants transacted business in Maine between 2008 and 2016 through at least seven car dealerships in Maine.

18.     Accordingly, the exercise of specific jurisdiction over all Defendants is consistent with due process.

19.     Venue is proper in Kennebec County pursuant to 14 M.R.S. § 501 because the Plaintiff has its principal place of business in that county.

## FACTS

### A.      The Defendants Acted in Concert to Violate Environmental Laws.

20.     At all times relevant to this Complaint, the Defendants worked in concert with the common objective of engaging in the emissions cheating scheme described in this Complaint. Each of the Defendants was, and still is, the agent of the others for this purpose, and each has

7

acted, and is acting, for the common goals and profit of them all.  Therefore, all acts and knowledge ascribed to one of them are properly imputed to the others.  Among other things:

    a.    Volkswagen AG allocated and controlled the overall research and development and marketing budgets for the brands in the VW Group;

    b.    For the Subject Vehicles that the Defendants sold in the United States, VWGoA's EEO acted as their representative before U.S. regulators for compliance and certification-related issues;

    c.    The three brands (Volkswagen, Audi, and Porsche) shared engineering research and development and engine concepts and designs, including, in this case, VW AG's incorporation of Audi-designed software and hardware elements into its EA 189 diesel engine for the Generation 1 and 2 Subject Vehicles, and Porsche AG's use of the Audi 3.0 liter diesel engine for its Cayenne SUV Subject Vehicle;

    d.    Officers and employees of the Defendants, including several of those involved in the unlawful conduct described in this Complaint, were shared among the Defendants, and have moved from the employ of one Defendant to another; and

    e.    Senior management at Volkswagen AG, VWGoA, and Audi AG discussed, planned, and coordinated the response to the diesel scandal as it unfolded for Volkswagen, Audi and Porsche models in the United States.

21.    At all relevant times, each Defendant acted:  (a) as a principal; (b) under express or implied agency; and/or (c) with actual or ostensible authority to perform the acts alleged in this Complaint on behalf of every other named Defendant.

22.     Each Defendant knew, or should have known, that the other Defendants were engaging in or planned to engage in violations of law alleged in this Complaint.  Despite knowing that the other Defendants were engaging in such unlawful conduct (or despite the fact that they should have known that the other Defendants were engaging in unlawful conduct), each Defendant nevertheless facilitated the commission of those unlawful acts.  Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

23.     At a minimum, each of the Defendants provided each of the other Defendants with substantial assistance, or aided and abetted one another, in carrying out individual company-by-company unlawful emissions schemes, as described in this Complaint.

24.     Each Defendant engaged in multiple violations of Maine's environmental laws. The conduct of each of the Defendants was knowing and willful.

**B.     The Defendants Developed and Placed Defeat Devices in Volkswagen, Audi, and Porsche Models Equipped With 2.0 and 3.0 Liter Diesel Engines, Model Years 2009 through 2016, Sold in the U.S., Including in Maine.**

25.     Volkswagen AG and other Defendants designed and developed and ultimately marketed and sold a line of diesel turbocharged direct injection ("TDI") 2.0 and 3.0 liter light duty diesel vehicles (the Subject Vehicles) throughout the U.S., including in Maine.

26.     The Subject Vehicles include several makes and models sold or leased in the United States for the 2009 through 2016 model years.  For the 2.0 liter vehicles, there were three "generations" of TDI 2.0 liter vehicles that differed in engine design and/or emissions control system.  The makes and models for each of the 2.0 and 3.0 liter Subject Vehicles are summarized in the table below:

9

**2.0 Liter Diesel Models**

| Model Year (MY) | Generation (Gen)/Engine | Environmental Protection Agency ("EPA") Test Group | Vehicle Make and Model(s) |
|---|---|---|---|
| 2009 | Gen 1 /EA189 | 9VWXV02.035N 9VWXV02.0U5N | VW Jetta, VW Jetta Sportwagen |
| 2010 | Gen 1 /EA189 | AVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2011 | Gen 1 /EA189 | BVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2012 | Gen 1 /EA189 | CVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2013 | Gen 1 /EA189 | DVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2014 | Gen 1 /EA189 | EVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen |
| 2012 2013 2014 | Gen 2 /EA189 | CVWXV02.0U4S DVWXV02.0U4S EVWXV02.0U4S | VW Passat |
| 2015 | Gen 3 /EA288 | FVGAV02.0VAL | VW Beetle, VW Beetle Convertible, VW Golf, VW Golf Sportwagen, VW Jetta, VW Passat, Audi A3 |

**3.0 Liter Diesel Models**

| Model Year (MY) | EPA Test Group(s) | Vehicle Make and Model(s) |
|---|---|---|
| 2009 | 9ADXT03.03LD | VW Touareg, Audi Q7 |
| 2010 | AADXT03.03LD | VW Touareg, Audi Q7 |
| 2011 | BADXT03.02UG BADXT03.03UG | VW Touareg Audi Q7 |
| 2012 | CADXT03.02UG CADXT03.03UG | VW Touareg Audi Q7 |
| 2013 | DADXT03.02UG DADXT03.03UG DPRXT03.0CDD | VW Touareg Audi Q7 Porsche Cayenne Diesel |
| 2014 | EADXT03.02UG EADXT03.03UG EPRXT03.0CDD EADXJ03.04UG | VW Touareg Audi Q7 Porsche Cayenne Diesel Audi A6 Quattro, A7 Quattro, A8L, Q5 |

10

| 2015 | FVGAT03.0NU2 | VW Touareg |
| | FVGAT03.0NU3 | Audi Q7 |
| | FPRXT03.0CDD | Porsche Cayenne Diesel |
| | FVGAJ03.0NU4 | Audi A6 Quattro, A7 Quattro, A8L, Q5 |
| 2016 | GVGAT03.0NU2 | VW Touareg |
| | GPRXT03.0CDD | Porsche Cayenne Diesel |
| | GVGAJ03.0NU4 | Audi A6 Quattro, A7 Quattro, A8L, Q5 |

27.     For clarity, throughout this Complaint:

a.      the 2.0 liter Generation 1/EA-189s, the Generation 2/EA-189s, and the Generation 3/EA-288s identified above will be referred to as "Generation 1s," "Generation 2s," and "Generation 3s," respectively, and will be referred to collectively as "2.0s";

b.      the 3.0 liter models will be referred to collectively as "3.0s"; and

c.      the 2.0s and 3.0s collectively comprise the "Subject Vehicles."

28.     At all relevant times, Defendant VWGoA, including its AoA unit, were responsible for marketing and selling the Volkswagen and Audi brand Subject Vehicles, subject to coordination with and general oversight by Volkswagen AG and Audi AG.

29.     At all relevant times, Porsche NA was responsible for marketing and selling the model year 2013 to 2016 Cayennes, subject to coordination with and general oversight by Porsche AG.

30.     Defendants sold, leased, and warranted more than 573,000 Subject Vehicles in the United States between 2008 and 2015, of which more than 487,000 were 2.0s and more than 86,000 were 3.0s.

31.     Approximately 3,500 Subject Vehicles, including 2.0s and 3.0s, were sold or leased in Maine between 2008 and 2015.  As of October 1, 2015, 3,982 Subject Vehicles were registered through the Maine Department of Motor Vehicles.

11

32.     Defendants developed and placed defeat devices in the Subject Vehicles including in the Subject Vehicles delivered to Maine and sold or leased in Maine.

**C.     Defendants' Defeat Device Development and Implementation Was Not an Isolated Event but an Iterative Process Across Different Emissions Control Systems and Different Vehicle Types.**

33.     In trying to leverage its existing diesel engine technology for the U.S. market, Defendants faced an engineering challenge:  diesel engines are high $NO_x$ emitters, making compliance with U.S. regulation of $NO_x$ emissions particularly challenging.

34.     To sell each new model year of the Subject Vehicles in the U.S., Volkswagen AG and Audi AG (acting through VWGoA's EEO) and Porsche AG (acting through Porsche NA), applied for and obtained (typically in the year prior to the particular model year) Certificates of Conformity from the U.S. Environmental Protection Agency ("EPA") and Executive Orders from the CARB.  In those applications, Defendants were required to disclose, among other things, all Auxiliary Emissions Control Devices ("AECDs") in the vehicles, i.e., any engine function that senses temperature, vehicle speed, engine RPM, or any other parameter for the purpose of activating, modulating, or deactivating the operation of any part of the emissions control system.  For each such AECD, Defendants were required to provide a written, detailed justification; the parameters the AECD senses and controls; and a rationale for why the AECD was not a "defeat device."

35.     An AECD that operates to thwart applicable emissions standards by reducing the effectiveness of an automobile's emissions control in everyday driving conditions is known in the industry as a "cycle-beater," and in U.S. legal terms, as a "defeat device."  Deployment of defeat devices is prohibited under Maine law.  06-096 CMR chapter 127, § 4(A)(1).

36.     Defendants certified the new Generation 1s, the Generation 2s, and the 3.0s to California's Low-Emission Vehicle (LEV) II emissions standards, which imposed a $NO_x$ emission limit of 0.05 grams per mile (g/mi) at a durability standard of 50,000 miles and 0.07 g/mi at 120,000 miles.

37.     Defendants certified the new Generation 3s to California's LEV III emissions standards, which imposed a combined non-methane organic gas and $NO_x$ limit of 0.125 g/mi at a durability standard of 150,000 miles.

38.     Unwilling to design and manufacture the Subject Vehicles so that they would meet these standards in all conditions (during laboratory testing and in real driving conditions, in the customer's hands), Defendants cheated.

39.     Defendants implemented a defeat device in the form of test recognition software in the Subject Vehicles' engine control units ("ECUs") that recognized when the Subject Vehicles were undergoing laboratory testing, such as test cycles on a rolling dynamometer (also known as a "treadmill" or "roller" or "dyno") using time and temperature parameters, among others.  When the defeat device software detected a test cycle, it altered the emissions controls to bring emissions into compliance with applicable standards.  Outside of the test cycle, the defeat device software lowered the emissions controls, resulting in $NO_x$ emissions far in excess of permissible limits.

40.     For example, the defeat devices on the 2.0 liter cars worked by directing the engine to run in one of two modes:  a "testing" mode during which the car's emissions systems were fully operational, and a "driving" mode during which the car's emissions systems were substantially deactivated.

13

41.     Every time one of these cars was started, it automatically entered into "testing" mode.  During the first several minutes of operation, the software checked the car's acceleration and speed profile against the tightly defined acceleration and speed profiles of the government-specified emissions test cycles used to test a car's emissions.

42.     If the defeat device software determined that the car was running in a test cycle, it kept the engine in "testing" mode so that the car's emissions controls remained fully operational. If on the other hand the software determined the car was being driven in normal, random conditions as occur in real-world driving, the defeat device software switched the engine into "driving" mode, during which emissions controls were substantially deactivated, with the effect that $NO_x$ emissions increased by a factor of up to 40 times above legal limits.

43.     The diesel exhaust after-treatment technology Defendants designed and implemented in the Subject Vehicles changed over time and across engine generations, but certain key emissions control features remained constant:  all the Subject Vehicles employed exhaust gas recirculation and were equipped with a diesel particulate, or soot, filter ("soot filter").

44.     Exhaust gas recirculation was used primarily to reduce $NO_x$ emissions by redirecting exhaust back into the engine's intake system and mixing it with fresh air, thereby reducing the amount of oxygen in the engine, lowering the combustion temperature, and reducing the creation of $NO_x$.

45.     The soot filter was used to remove particulate emissions (that is, soot) from the engine's exhaust.  The soot accumulates in the soot filter until it is periodically burned off and emitted as ash in what are known as "soot filter regenerations" to prevent the soot filter from becoming clogged or overloaded.

46.     The defeat devices installed by Defendants on the Subject Vehicles varied over time and engine type.

### Defeat Device—Volkswagen Generations 1s

47.     In 2006, Volkswagen AG decided to use for its Generation 1's engine a lean-$NO_x$ trap ("lean trap"), which operated by trapping $NO_x$ emissions in a catalytic converter and then periodically running the engine in a fuel-rich, oxygen-lean mode to activate the catalytic converter, so as to enable it to break down its trapped $NO_x$ into benign nitrogen and oxygen.

48.     To overcome resulting issues with the soot filter, in late 2006, with the knowledge and approval of their managers, Volkswagen AG's engineers in Wolfsburg adapted a defeat device that Audi AG had developed and used previously in the European market (termed the "acoustic function" defeat device).

49.     Like the Audi AG defeat device, the defeat devices implemented in the Generation 1s featured software that could detect when the vehicles were undergoing a dyno test based on, among other parameters, temperature and time.  During a dyno test, the defeat device software substantially increased the frequency of lean trap regenerations and increased exhaust gas recirculation to bring $NO_x$ emissions down to compliant levels.  In contrast, during real-world driving, the defeat device software substantially reduced the frequency of lean trap regenerations and reduced exhaust gas recirculations resulting in $NO_x$ emissions up to 40 times the legal limit.

50.     Volkswagen AG incorporated the lean trap regeneration and exhaust gas recirculation defeat devices described above in the engine control units (ECUs) of the model year 2009-2014 Jetta, Golf, A3, and new Beetle diesel models.  Over 300,000 of these Generation 1 vehicles (model years 2009-2014) were sold in the United States, including in Maine.

**Defeat Device—Audi 3.0 SUVs**

51.    At the time Volkswagen AG's engineers in Wolfsburg were developing the Generation 1 diesel engine, their colleagues at Audi AG's Neckarsulm headquarters were developing a U.S.-market 3.0 liter diesel engine for the anticipated release in model year 2009 of a new line of luxury diesel SUVs in the U.S. market:  the Audi Q7 and Volkswagen Touareg, both equipped with selective catalytic reduction systems.

52.    In addition to the exhaust gas recirculation defeat device implemented in the Generation 1s, the 3.0s also featured a urea dosing defeat device.  The urea dosing defeat device operated to increase urea dosing during dyno testing and reduce the urea dosing to an artificial limit during real driving conditions to enable the too-small urea tanks to last for 10,000 miles between service intervals.

53.    Audi AG installed the urea dosing defeat device and the exhaust gas recirculation defeat device for production into the 3.0s for sale in the U.S. market from 2009-2016, resulting in $NO_x$ emissions of up to nine times the legal limit in everyday driving conditions.  Not including the Porsche Cayenne diesel SUVs discussed below, approximately 74,500 of the 3.0s (model years 2009 to 2016) were sold in the United States, including in Maine.

**Defeat Device--Volkswagen Generation 2s**

54.    In 2009, Volkswagen AG turned its attention to the planned roll-out in the U.S. of the model year 2012 Generation 2 Passat equipped with selective catalytic reduction.

55.    For these vehicles, Volkswagen AG opted to implement defeat devices that would control exhaust gas recirculation and urea dosing.  In testing mode, the defeat device software increased exhaust gas recirculation and urea dosing to bring the $NO_x$ emissions within regulatory

limits.  Outside of test conditions, however, the defeat device software reduced the urea dosing rate by half to conserve urea and reduced exhaust gas recirculation.

56.     With the approval of Defendants' supervisory executives, company engineers went forward with the dosing and exhaust gas recirculation defeat devices, installing them in roughly 80,000 Volkswagen Passats in the U.S. market, including in Maine, spanning from model year 2012-2014.  In real-world conditions, the Generation 2.0s sold in this country exceeded lawful $NO_x$ emissions levels by up to twenty times.

### Defeat Device—Porsche Cayenne

57.     In 2010, Volkswagen AG acquired Porsche AG, and the founding family of Porsche became Volkswagen's leading shareholders.  The following year, Porsche decided to enter the U.S. diesel market with its new Cayenne SUV.

58.     Porsche AG approached its sister company Audi AG about acquiring Audi AG's 3.0 liter V6 diesel engine for use in the Cayenne.  Audi AG agreed to supply Porsche AG the U.S.-market 3.0, lightly re-tuned for Porsche AG.  In supplying the engine, Audi AG personnel communicated to their counterparts at Porsche AG about the engine's primary features, including the urea dosing strategy that Audi AG had devised.

59.     Notwithstanding this information, Porsche AG's engineering department proceeded to source the Audi defeat-device equipped 3.0 liter engine for its entry into the U.S. diesel market with the MY 2013 Cayenne diesel SUV.

60.     Approximately 13,600 of the defeat device-equipped Porsche vehicles, model years 2013 to 2016, were sold or leased in the U.S., including in Maine.

61.     With the defeat device, Porsche Cayennes were estimated to emit $NO_x$ at roughly nine times the legal limit.

17

### Defeat Device—Volkswagen Generation 3s

62.     In or about 2013, Volkswagen AG and other Defendants discontinued the lean trap emissions system in favor of a selective catalytic reduction-based system for all its model year 2015 2.0s (the Beetle, Golf, Jetta, Passat, and Audi A3).

63.     In doing so, Defendants again opted to implement exhaust gas recirculation and urea-dosing defeat devices like those they implemented in the Generation 2s and the 3.0s.

64.     Defendants sold nearly 100,000 of the model year 2015 Generation 3s in the United States, including in Maine.  These cars continued to be sold even after Defendants became aware that independent real-world studies made clear that the Subject Vehicles were emitting $NO_x$ in real driving conditions far in excess of legal limits.

**D.     Defendants Manipulated the On-Board Diagnostics Systems to Conceal the Defeat Devices.**

65.     Maine and other states have adopted Inspection and Maintenance ("I&M") programs that require motor vehicles to pass periodic inspection tests that evaluate, among other things, the vehicles' emissions systems.  In Maine, as elsewhere, the inspection tests do not directly measure the vehicles' emissions, but rely instead on the vehicles' on-board diagnostics ("OBD") to relay information on whether the vehicles' emissions system is functioning properly.  State and federal law require auto manufacturers to equip their cars with OBD systems that electronically report failures of emissions systems to mechanics or inspectors during service or inspection.  At all times relevant to this Complaint, Maine required inspection of the OBD system (as part of an enhanced inspection) for motor vehicles required to be registered in Cumberland County.  Motor vehicles not required to be registered in Cumberland County may have such an inspection.

66.     During an inspection, properly functioning OBD systems would have reported the failure of Defendants' defeat-device equipped cars as exceeding emission limits and would have alerted inspectors, mechanics, and car owners that the cars' emissions systems were not functioning correctly and required repair.

67.     To allow its vehicles, equipped with defeat devices, to pass Maine's and other states' inspection and maintenance tests, Defendants therefore needed to and, in fact, did implement a further cheat:  they programmed the OBD systems on the cars equipped with defeat devices to falsely report at inspection time that the automobiles' emissions systems, including exhaust gas recirculation, were working properly.

68.     This deception subverted Maine's I&M program and caused a substantial waste of time and resources.  Despite subjecting the Subject Vehicles that were required to be registered in Cumberland County to numerous periodic OBD inspections, Maine's inspectors, mechanics, and car owners were misled into believing that Defendants' vehicles complied with applicable environmental laws when, in fact, they violated those laws.

**E.     Defendants Implemented the Defeat Devices Knowing They Were Illegal.**

69.     Emission Increasing-Auxiliary Emission Control Devices ("EI-AECDs") may be legal if they are designed to run only in limited, extreme driving circumstances to protect the engine, and only if (a) the automaker discloses them to the regulators; and (b) the regulators determine the software is not actually designed primarily to cheat the emissions test.

70.     The Defendants knew that the undisclosed defeat devices they employed could not be passed off as EI-AECDs.

71.     Despite being fully aware of the prohibitions in this country against defeat devices, Defendants proceeded to roll out hundreds of thousands of diesel vehicles with 2.0 and

3.0 liter engines onto the American market (including about 3,500 such vehicles in Maine) from

the 2009 through 2016 model years, all of which featured undisclosed and illegal defeat devices.

    **F.**    **Defendants Continued to Deny the Existence of the Defeat Devices and Mislead Regulators Even After Initial Evidence of their Existence Caught the Attention of U.S. Regulators.**

    72.    While acknowledging the defeat devices relatively openly in internal

communications, Defendants actively sought to conceal the defeat devices from regulators,

researchers, and the public.  Among other things, they:

    a.    directed the removal of reference to the defeat device (or the "acoustic function" as it was called internally) from ECU documentation;

    b.    buried the results of 2012-2013 internal testing that reflected real world $NO_x$ emissions exceeding U.S. limits by many multiples;

    c.    obfuscated in response to questions presented by Dutch researchers in March 2012 concerning lowered exhaust gas recirculation in real driving conditions and corresponding increases in $NO_x$ emissions;

    d.    denied independent researchers access to data that would confirm $NO_x$ discrepancies between testing and real driving conditions in Defendants' U.S. fleet; and

    e.    failed to disclose the illegal, emissions-increasing defeat devices in their certifications to state and federal regulators, which falsely represented full compliance with applicable emissions and durability standards.

    73.    On March 31, 2014, an Audi AG engineer alerted colleagues at Volkswagen AG

and VWGoA EEO to the upcoming publication of a report by the West Virginia University's

Center for Alternative Fuels, Engines & Emissions commissioned by the International Council

on Clean Transportation ("ICCT Report").  The ICCT Report found that real world emissions

from two of the three light-duty diesel vehicles it tested contained levels of $NO_x$ between five

and thirty-five times higher than the legal emissions limits.  West Virginia University researchers

conducted these tests using a portable emissions measurement system—essentially a lightweight

laboratory used to test and/or assess mobile source emissions in real driving conditions—rather

than on a dynamometer.

74.     The vehicles that failed were a 2012 Jetta with a lean trap (a Generation 1) and a

2013 Passat with a selective catalytic reduction system (a Generation 2).

75.     In a May 23, 2014, letter to the CEO and Chairman of Volkswagen AG's Board

of Managers, the Volkswagen AG Quality Assurance head warned:

> A thorough explanation for the dramatic increase in $NO_x$ emissions
> cannot be given to the authorities. It can be assumed that the
> authorities will then investigate the VW systems to determine
> whether Volkswagen implemented a test detection system in the
> engine control unit software (so-called defeat device) and, in the
> event a "treadmill test" is detected, a regeneration or dosing
> strategy  is implemented  that differs from real driving conditions.
> In Drivetrain Development, modified software versions are
> currently being developed which can reduce the RDE, but this will
> not bring about compliance with the limits, either.  We will inform
> you about the further development and discussion with the
> authorities.

76.     With the risks of detection in mind, Defendants embarked on a strategy to

deescalate and deflect scrutiny.  They publicly denied that the Subject Vehicles failed emissions

requirements.  They neutrally acknowledged the existence of the problem without explaining its

known cause to authorities or involving Volkswagen AG Group Product Safety, to maintain the

illusion that the problem was insignificant.

77.     From May 2014 until September 3, 2015 (and beyond for the 3.0 liter Subject

Vehicles), Defendants attempted to mislead and confuse regulators and the public about the true

cause of the high real-driving $NO_x$ emissions identified in the ICCT Report: Defendants'
installation of illegal defeat devices.

> **G.      After Months of Obfuscation and Concealment Defendants Admitted Their
> Use of Defeat Devices.**

78.      On or about August 5, 2015, the Volkswagen AG Engine Development head (and
former VWGoA EEO head) and the VWGoA EEO head met with CARB management and
admitted that, even after the software recalls, the Generation 1 and Generation 2s did not meet
legal requirements.

79.      On September 3, 2015, at a meeting attended by multiple CARB officials,
Volkswagen AG executives and managers, and the VWGoA EEO head, Volkswagen AG and
VWGoA admitted the existence of an illegal defeat device in the Generation 2s and disclosed the
existence of "test recognition software and engine map/dosing changes between road and chassis
dyno."

80.      At that September 3, 2015, meeting, Volkswagen AG and VWGoA admitted the
Generation 2 Engine Control Units had two calibrations:  one for real world driving ("Calibration
1") and one for testing ("Calibration 2").  They disclosed that, in Calibration 1, the urea dosing,
exhaust gas recirculation, and rail pressure were lower.  In Calibration 2, they disclosed that the
urea dosing, exhaust gas recirculation, and rail pressure were higher.

81.      On September 18, 2015, EPA issued to Volkswagen AG, Audi AG, and VWGoA
a Notice of Violation reflecting the agency's determination that:

> VW manufactured and installed defeat devices in certain model
> year 2009 through 2015 diesel light-duty vehicles equipped with
> 2.0 liter engines.  These defeat devices bypass, defeat, or render
> inoperative elements of the vehicles' emission control system that
> exist to comply with [Clean Air Act] emission standards. …
> Additionally, the EPA has determined that, due to the existence of
> the defeat devices in these vehicles, these vehicles do not conform

in all material respects to the vehicle specifications described in the applications for the certificates of conformity that purportedly cover them.

82.     The same day, CARB sent an "In-Use Compliance" letter to Volkswagen AG, Audi AG, and VWGoA describing its investigation of the reasons behind the high $NO_x$ emissions observed on their 2.0 liter diesel vehicles in real world driving conditions and its related discussions with VWGoA.  According to CARB, those discussions "culminated in VW's admission in early September 2015 that it has, since model year 2009, employed a defeat device to circumvent CARB and the EPA emission test procedures."

83.     In a second "In-Use Compliance" letter dated November 2, 2015, CARB notified Volkswagen AG, Audi AG, Porsche AG, Porsche NA, and VWGoA that it had conducted defeat device screening and certification testing on a model year 2016 Audi A6 and a model year 2014 Volkswagen Touareg and observed "the same type of emissions behaviors as those in which VW has admitted defeat devices exist."  CARB stated that "[t]hese activities corroborate testing conducted by U.S. EPA and Environment Canada on a 2014 VW Touareg . . . and a 2015 Porsche Cayenne . . . , respectively. This testing has also yielded evidence of a defeat device."

84.     On November 2, 2015, EPA issued to Volkswagen AG, Audi AG, Porsche AG, VWGoA, and Porsche NA a second Notice of Violation for model years 2014 to 2016 diesel light-duty vehicles equipped with 3.0 liter engines.

85.     On November 20, 2015, CARB issued a press release reporting that in a November 19, 2015 meeting with EPA and CARB, "VW and Audi officials . . . told EPA and CARB that the issues raised in the In-Use Compliance letter extend to all 3.0 liter diesel engines from model years 2009 through 2016."

86.     Thereafter, in an "In-Use Compliance" letter to Audi AG, Porsche AG, Porsche NA, Volkswagen AG, and VWGoA, dated November 25, 2015, CARB confirmed its determination that all 3.0 liter model-years 2009-2016 diesel test groups of these manufacturers are in noncompliance with CARB standards.

### H.     The Defendants Knew that the Subject Vehicles Emitted $NO_x$ Emissions In Amounts Far Higher Than Permitted.

87.     At all relevant times, Volkswagen AG, Audi AG, and Porsche—and Volkswagen AG's U.S. subsidiary, VWGoA, have known that the defeat devices installed in the 2.0 and 3.0s they manufactured and sold in the United States, including in Maine, caused the Subject Vehicles to emit many times the allowed $NO_x$ during normal operation in violation of state laws and regulations promulgated to protect human health and the environment from mobile sources of air pollution.

88.     The excess $NO_x$ emitted by the Subject Vehicles combines in the atmosphere with volatile organic compounds ("VOCs") in a complicated reaction in the presence of heat and sunlight to form ozone, a major component of urban smog that harms the public health and damages the environment.

89.     Ozone contributes to many human respiratory health problems, including chest pains, shortness of breath, coughing, nausea, throat irritation and increased susceptibility to respiratory infections and illnesses, such as asthma, and disproportionately affects vulnerable members of society, particularly children and the elderly.

90.     $NO_x$ emissions also cause eutrophication of and excess nutrient loading in coastal and other waters, reduce the diversity of fish and other life in these waters, and, along with sulfur dioxide found in the atmosphere from other sources, contribute to the creation of fine nitrate and sulfate particles.  Like ozone, fine particulates affect Maine's residents by causing human

respiratory distress, cardiovascular disease, and even premature mortality.  Fine nitrate and sulfate particles are also toxic to aquatic life and vegetation.

91.     At all relevant times, Defendants have been aware of the requirements of the state environmental statutes and rules more particularly described elsewhere in this Complaint.  For example, the Maine LEV Rule at 06-096 CMR chapter 127, § 8, requires car manufacturers to submit a report to Maine annually demonstrating that the manufacturer has met the fleet average Non-methane Organic Gas ("NMOG") or NMOG + $NO_x$ emission requirements in chapter 127, § 7, and the Defendants have been filing such fleet average reports with Maine, including for the model years represented by the Subject Vehicles.  As a result of the defeat devices in the Subject Vehicles, those fleet averages submitted by the Defendants were false.

92.     Likewise, in order to obtain certification to sell the Subject Vehicles in the United States, Defendants submitted to the EPA and CARB applications for each model year for Emissions Certifications falsely certifying the Subject Vehicles' compliance with applicable emissions and durability standards and the California regulations.  These applications contained the following false statements:

Statement of Compliance:

> The Volkswagen Group states that any element of design, system, or emission control device installed on or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of the Volkswagen Group's information and belief, cause the emission into the ambient air of pollutants in the operation of its motor vehicles or motor vehicle engines which cause or contribute to an unreasonable risk to public health or welfare except as specifically permitted by the standards prescribed under section 202 of the Clean Air Act. The Volkswagen Group further states that any element of design, system, or emission control device installed or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines, for the purpose of complying with

> standards prescribed under section 202 of the Clean Air Act, will
> not, to the best of the Volkswagen Group's information and belief,
> cause or contribute to an unreasonable risk to public safety.

Durability Statement:

> Based on the Volkswagen Group's good engineering judgment, all
> the vehicles described in this Application for Certification comply
> with all applicable intermediate and full useful life standards.

93.     Moreover, Defendants failed to disclose or describe the defeat devices on the list of AECDs required in the applications.  To the extent Defendants disclosed the existence of them as AECDs, Defendants falsely represented they were "active" in all conditions (i.e., in test and real driving conditions).

94.     Defendants' certifications to state and federal environmental regulators concerning the Subject Vehicles' purported compliance with applicable law were false and misleading.  As a result, Defendants sold or leased about 3,500 non-compliant Subject Vehicles in Maine between 2008 and 2015.

95.     Window stickers affixed to each of the Subject Vehicles for sale or lease reflected average "smog ratings" when, in fact, the Subject Vehicles' $NO_x$ emissions—a major factor in smog ratings—actually exceeded applicable standards by as much as 40 times.  For example, the representations below were affixed to the window of a 2013 Golf TDI:

**Good Clean Diesel Fun.** 



96.     In California emissions warranties (applicable to residents of Maine pursuant to the Maine LEV Rule, 06-096 CMR chapter 127, § 5), Defendants expressly warranted to each purchaser or lessee and any subsequent purchaser or lessee that every Subject Vehicle was "designed, built and equipped" to conform with applicable CARB requirements (and, therefore, the Maine LEV Rule), including $NO_x$ exhaust emission standards.

97.     These express warranties were categorically false in light of the installation of the defeat devices.

98.     As a result of Defendants' business practices and failure to disclose that under normal operating conditions the Subject Vehicles emit up to 40 times the allowed levels of $NO_x$ pollution, Defendants sold and leased Subject Vehicles that, based on initial estimates, have illegally emitted over 45,000 additional tons of $NO_x$ emissions in the U.S.

## REGULATORY BACKGROUND

99.     Maine's environmental laws require motor vehicles to meet certain emissions standards.

100.    The Maine Air Law, 38 M.R.S. § 585-D, provides that the Department may adopt and enforce standards that meet the requirements of Section 177 of the federal Clean Air Act, 42 U.S.C. § 7507, relating to control of emissions from new motor vehicles or new motor vehicle engines.  Section 177 of the Clean Air Act provides authority to states such as Maine to adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take certain other actions (including requiring certification, inspection, or other approval as condition precedent to initial retail sale, titling, or registration) if such standards are identical to California standards for which a waiver has been granted for such model year.

101.    The Maine Air Law, 38 M.R.S. § 585-D, provides that the "standards, known as a 'low-emission vehicle program,' must be designed to prevent air pollution and achieve and maintain ambient air quality standards within the State."

102.    Pursuant to the Maine Air Law and the federal Clean Air Act, the Department adopted 06-096 CMR Chapter 127, New Motor Vehicle Emission Standards ("Maine LEV Rule") effective beginning with model year 2001.

103.    At all times relevant to this Complaint, the Maine LEV Rule has incorporated by reference numerous emission-related standards from the State of California's motor vehicle standards found in the California Code of Regulations ("CCR"), Title 13, including California's exhaust emission standards, making these standards identical to California standards.  *See* Chapter 127, § 3 & Appendix A (listing sections incorporated by reference).  California's

standards are generally more stringent than those promulgated by EPA and enforced in those states that have not chosen to incorporate and enforce California's standards.  As a result, new vehicles delivered for sale or lease, offered for sale or lease, sold or leased, imported, or rented in Maine must meet more stringent emissions standards than many other states, and violations of these standards are violations of Maine law.

104.     Through the Maine Air Law and the Maine LEV Rule, Maine has established a comprehensive regulatory scheme designed to prevent the release of pollution to the air by controlling the amount of air contaminants, like $NO_x$, that are emitted from motor vehicles.

105.     At all times relevant to this Complaint, the Maine LEV Rule, Chapter 127, §§ 2(D) & 4(A), has prohibited any person, including a manufacturer or dealer, from delivering for sale or lease, offering for sale or lease, selling or leasing, importing, or renting a new vehicle that is a 2001 and subsequent model-year passenger car or light-duty truck, unless the vehicle or engine is California-certified, meaning the vehicle has a valid executive order from and is approved by the California Air Resources Board ("CARB") for sale in California.  To be certified by CARB, among other things, a vehicle must be demonstrated to meet exhaust emission requirements of the applicable California regulations.

106.     At all times relevant to this Complaint, the Maine LEV Rule, Chapter 127, § 4(A)(1), has prohibited any person, including a manufacturer or dealer, from delivering for sale or lease, offering for sale or lease, selling or leasing, importing, or renting a new vehicle that is a 2001 and subsequent model-year passenger car or light-duty truck, unless the vehicle complies with the exhaust emissions standards, including $NO_x$, for passenger vehicles, incorporated from California's standards into this rule.

107.    At all times relevant to this Complaint, but varying somewhat depending upon the version of the rule in effect, the Maine LEV Rule, Chapter 127, § 4(A)(2), has prohibited any person, including a manufacturer or dealer, from delivering for sale or lease, offering for sale or lease, selling or leasing, importing, or renting a new vehicle that is a 2001 and subsequent model-year passenger car or light-duty truck, unless the vehicle complies with the emission control label requirements, the smog index label requirements for 2002 through 2009 model years, and the "Environmental Performance Label" or a "Federal Fuel Economy and Environmental Label" for 2010 and subsequent model years, in accordance with 13 CCR § 1965.

108.    At all times relevant to this Complaint, the Maine LEV Rule, Chapter 127, § 4(A)(5) and Appendix A, has prohibited any person, including a manufacturer or dealer, from delivering for sale or lease, offering for sale or lease, selling or leasing, importing, or renting a new vehicle that is a 2001 and subsequent model-year passenger car or light-duty truck, unless the vehicle complies with the malfunction and diagnostic system requirements in the incorporated California regulations which set forth various requirements for the functioning of the on-board diagnostic ("OBD") system.

109.    Since 1999, Maine has required an enhanced vehicle inspection that includes visual and electronic examination of the OBD system for motor vehicles that are required to be registered in Cumberland County.  29-A M.R.S. §§ 1751(2-A), 1756(7); 16-222 CMR Chapter 1, §§ 100.01(9), 115.01(10), 115.40(2).

110.    At all times relevant to this Complaint, the Maine LEV Rule, through its incorporation of California regulations, has prohibited the use of defeat devices in any new light-duty vehicles and certain other vehicles.  *See* Chapter 127, § 4(A)(1); 13 CCR § 1961(d) (model year 2001 to 2014); 13 CCR § 1961.2(d) (model year 2015 on).

30

111.     At all times relevant to this Complaint, Maine law has prohibited operating a
motor vehicle on a public way if any operational element of the air pollution control system of
that vehicle has been removed, dismantled, or otherwise rendered inoperative.  29-A M.R.S.
§ 2111(2).

112.     At all times relevant to this Complaint, the Maine LEV Rule, Chapter 127, § 5,
has required for all 2004 and subsequent model-year California-certified vehicles delivered for
sale to Maine, that each manufacturer shall provide a warranty for the ultimate purchaser and
each subsequent purchaser that complies with the requirements of the incorporated California
regulations.

113.     At all times relevant to this Complaint, the Maine LEV Rule, Chapter 127, § 8,
has required manufacturers to submit annually to the Department reports documenting total new
vehicles delivered for sale or lease in Maine, and demonstrating that the manufacturer has met
the fleet requirements for Maine contained in Chapter 127, § 7.  Depending on the version of the
Maine LEV Rule in effect during the times relevant to this Complaint, Section 7 has required, for
2004 through 2014 model years, that each manufacturer shall comply with the fleet average
NMOG exhaust emission requirements, in accordance with 13 CCR § 1961, and for 2015 and
subsequent model years, each manufacturer shall comply with the fleet average NMOG + $NO_x$
exhaust emission requirements, in accordance with 13 CCR § 1961.2.

114.     Pursuant to 38 M.R.S. § 348(1), in the event of a violation of any provision of  the
laws administered by the Department or of any rule of the Department, the Attorney General
may institute a civil action and may institute injunction proceedings to enjoin any further
violation thereof.

115.    Pursuant to 38 M.R.S. § 349(2), a person who violates a law or rule administered by the Department is subject to a civil penalty of not less than $100 and not more than $10,000 for each day of the violation.

## CAUSES OF ACTION

**COUNT I.    VIOLATIONS OF THE MAINE LEV RULE ARISING FROM DEFENDANTS' FAILURE TO OBTAIN OR RECEIVE VALID CARB EXECUTIVE ORDERS**

116.    The State re-alleges the paragraphs above and incorporates them herein by reference.

117.    Pursuant to the Maine LEV Rule, Chapter 127, § 4(A), no person, including a manufacturer or dealer, shall deliver for sale or lease, offer for sale or lease, sell or lease, import, or rent a new vehicle that is a 2001 and subsequent model-year passenger car or light-duty truck, in Maine unless the vehicle or engine is California-certified.  That is, new vehicles must be covered by a valid executive order from CARB and approved by CARB for sale in California. Chapter 127, §§ 4(A), (2)(D).  California executive orders include certification that vehicles comply with California's exhaust emission standards.

118.    The Maine LEV Rule, Chapter 127, § 4, applies to all of the model years and vehicle types represented by the Subject Vehicles.

119.    For each of the model years 2009 through 2016, Defendants did not obtain or receive valid CARB executive orders for the Subject Vehicles because the executive orders were procured by submitting to CARB fraudulent emissions data and information that failed to disclose the existence of the defeat devices.

120.    For each of the model years 2009 through 2016, Defendants delivered for sale or lease, offered for sale or lease, sold or leased, imported, or rented the Subject Vehicles, or caused

32

the Subject Vehicles to be delivered for sale or lease, offered for sale or lease, sold or leased, imported, or rented, in Maine without valid CARB executive orders for all applicable requirements of the California Code of Regulations adopted and incorporated into the Maine LEV Rule by reference, in violation of the Maine LEV Rule, Chapter 127, § 4(A).

121.    Each Subject Vehicle without a valid CARB executive order in violation of Chapter 127 represents a separate violation for the purpose of 38 M.R.S. § 349(2), and a civil penalty for each day of continued violation should be assessed.

## COUNT II.    VIOLATIONS OF THE MAINE LEV RULE EMISSIONS STANDARDS AND ON-BOARD DIAGNOSTIC REQUIREMENTS ARISING FROM DEFENDANTS' USE OF DEFEAT DEVICES

122.    The State re-alleges the paragraphs above and incorporates them herein by reference.

123.    Pursuant to the Maine LEV Rule, Chapter 127, § 4(A)(1) and (5) and Appendix A, no person, including a manufacturer or dealer, shall deliver for sale or lease, offer for sale or lease, sell or lease, import, or rent a new vehicle (that is a 2001 and subsequent model-year passenger car or light-duty truck) in Maine, unless the vehicle or engine complies with the exhaust emissions standards and the malfunction and diagnostic system requirements in the California regulations adopted and incorporated into the Maine LEV Rule by reference.

124.    The exhaust emissions standards incorporated by reference include, but are not limited to, emissions standards for $NO_x$ that are set forth in 13 CCR §§ 1961 & 1961.2.

125.    For each of the model years 2009 through 2016, Defendants delivered for sale or lease, offered for sale or lease, sold or leased, imported, or rented the Subject Vehicles, or caused the Subject Vehicles to be delivered for sale or lease, offered for sale or lease, sold or leased, imported, or rented, in Maine, and those Subject Vehicles exceeded the $NO_x$ emissions standards

33

in violation of Chapter 127, § 4(A)(1), and contained defeat devices that obviated the intended purpose of the OBD system in violation of the various requirements for the functioning of the OBD system as set forth in 13 CCR § 1968.1 and 1968.2, in violation of the Maine LEV Rule, Chapter 127, § 4(A)(5) and Appendix A.

126.     Each Subject Vehicle in violation of the $NO_x$ emissions standards and the OBD system requirements in Chapter 127 represents a separate violation for the purpose of 38 M.R.S. § 349(2), and a civil penalty for each day of continued violation should be assessed.

## COUNT III:   VIOLATIONS OF THE MAINE LEV RULE LABELING REQUIREMENTS

127.     The State re-alleges the paragraphs above and incorporates them herein by reference.

128.     Pursuant to the Maine LEV Rule, Chapter 127, § 4(A)(2), no person, including a manufacturer or dealer, shall deliver for sale or lease, offer for sale or lease, sell or lease, import, or rent a new vehicle (that is a 2001 and subsequent model-year passenger car or light-duty truck) in Maine unless the vehicle or engine complies with the emission control label requirements, the smog index label requirements for 2002 through 2009 model years, and the "Environmental Performance Label" or a "Federal Fuel Economy and Environmental Label" for 2010 and subsequent model years in accordance with 13 CCR § 1965.

129.     The emission control and environmental labels affixed to the Subject Vehicles were not valid because Defendants fraudulently procured the certifications on which the labels were based by disclosing to California inaccurate and falsified emissions and technical information about the Subject Vehicles.

130.     Accordingly, for each of the model years 2009 through 2016, Defendants delivered for sale or lease, offered for sale or lease, sold or leased, imported, or rented the

34

Subject Vehicles, or caused the Subject Vehicles to be delivered for sale or lease, offered for sale or lease, sold or leased, imported, or rented, in Maine without valid environmental labels, in violation of the Maine LEV Rule, Chapter 127, § 4(A)(2).

131.    Each Subject Vehicle in violation of the labelling requirements in Chapter 127 represents a separate violation for the purpose of 38 M.R.S. § 349(2), and a civil penalty for each day of continued violation should be assessed.

## COUNT IV:   VIOLATIONS OF THE MAINE LEV RULE ON WARRANTIES

132.    The State re-alleges the paragraphs above and incorporates them herein by reference.

133.    The Maine LEV Rule, Chapter 127, § 5, requires manufacturers of 2004 and subsequent model-year California-certified vehicles that are delivered for sale to Maine to provide a warranty for the ultimate purchaser and each subsequent purchaser that complies with the requirements of 13 CCR §§ 2035 through 2040, and 2046.

134.    By installing and using a defeat device on each of the Subject Vehicles to make it impossible for its emissions control system to perform as it was and is required to perform, Defendants violated the terms of their warranties and could not possibly continue to warrant that each such vehicle would comply with the terms of those warranties, in violation of Chapter 127, § 5.

135.    Each Subject Vehicle delivered for sale to Maine in violation of the warranty requirement in Chapter 127 represents a separate violation for the purpose of 38 M.R.S. § 349(2), and a civil penalty for each day of continued violation should be assessed.

**COUNT V.    VIOLATIONS OF THE MAINE LEV RULE ON FLEET AVERAGE EMISSIONS AND REPORTING**

136.    The State re-alleges the paragraphs above and incorporates them herein by reference.

137.    The Maine LEV Rule, Chapter 127, § 8, requires manufacturers to submit annually to the Department reports documenting total new vehicles delivered for sale or lease in Maine, and demonstrating that the manufacturer has met its fleet requirements, including for NMOG and NMOG + $NO_x$ emission requirements, pursuant to Chapter 127, § 7.

138.    The Maine LEV Rule, Chapter 127, § 7, requires manufacturers to comply with the fleet average NMOG emission requirements for 2004 through 2014 model years, and to comply with the fleet average NMOG + $NO_x$ emission requirements for 2015 and subsequent years.

139.    For each of the model years 2009 through 2016, Defendants violated Chapter 127, §§ 7 and 8 by submitting to the Department NMOG or NMOG + $NO_x$ fleet average reports pursuant to the Maine LEV Rule, Chapter 127, § 8, that failed to accurately demonstrate compliance with fleetwide average emission requirements due to fraudulent certification and emissions data for the Subject Vehicles because of the use of the defeat devices.

140.    Each fleetwide average report for the Subject Vehicles submitted to the Department that failed to accurately demonstrate compliance with fleetwide average emission requirements due to fraudulent certification and emissions data, in violation of Chapter 127, represents a separate violation for the purpose of 38 M.R.S. § 349(2).

## PRAYER FOR RELIEF

WHEREFORE, the State requests that this Court, after adjudication on the merits, grant

the following relief:

A.      Order Defendants to pay to the State of Maine civil penalties pursuant to

38 M.R.S. § 349(2) for the violations set forth in this Complaint;

B.      Enter an order pursuant to 38 M.R.S. § 348(1) permanently enjoining Defendants

from delivering for sale or lease, offering for sale or lease, selling, leasing,

importing, or renting in Maine any new motor vehicle equipped with a defeat

device or any new motor vehicle not eligible for sale or lease pursuant to

emissions and environmental standards in Maine;

C.      Award the State costs and attorneys' fees pursuant to 14 M.R.S. § 1522; and

D.      Grant such additional and further relief as the Court deems appropriate and just.


Dated:  December 29, 2016                    Respectfully submitted,


                                             JANET T. MILLS
                                             Attorney General


                                             GERALD D. REID
                                             Maine Bar No. 8014
                                             MARY M. SAUER
                                             Maine Bar No. 7935
                                             Assistant Attorneys General
                                             6 State House Station
                                             Augusta, Maine 04333-0006
                                             207-626-8800
                                             Attorneys for Plaintiff


37